1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3    JAMIN BAILON and ROMIE ADAMS,
     as Personal Representative of
4    the WRONGFUL DEATH ESTATE OF
     JOHN THADDEUS BAILON, and
5    Next Friend of A.B., a Minor Child,

6                     Plaintiffs,

7         vs.                              CV-20-00230 LF/CG

8    VALENCIA COUNTY BOARD OF
     COUNTY COMMISSIONERS and JOSEPH
9    ROWLAND and JUAN RODRIGUEZ,
     in both their individual and their
10   official capacities,

11                    Defendants.

12

13               TRANSCRIPT OF PROCEEDINGS
                 FAIRNESS HEARING (VIA ZOOM)
14          BEFORE THE HONORABLE LAURA FASHING
               UNITED STATES MAGISTRATE JUDGE
15          WEDNESDAY, AUGUST 26, 2020, 2:00 P.M.
                   ALBUQUERQUE, NEW MEXICO

16

17

18   FOR THE PLAINTIFFS:

19        LAW OFFICE OF PHILIP B. DAVIS
          Attorneys at Law
20        1000 Lomas Boulevard, Northwest
          Albuquerque, New Mexico  87102
21        BY:  MR. PHILIP B. DAVIS

22        --AND--

23        CHAVEZ LAW FIRM, PC
          Attorneys at Law
24        10 Peralta Farms Court
          Peralta, New Mexico  87042
25        BY:  MR. STEVEN MARK CHAVEZ

2

1    FOR THE DEFENDANTS:

2         LAW OFFICE OF JONLYN M. MARTINEZ, LLC
          Attorneys at Law
3         Post Office Box 1805
          Albuquerque, New Mexico  87103
4         BY:  MS. JONLYN M. MARTINEZ

5

6    ALSO PRESENT:  MS. ROMIE ADAMS, Personal Representative

7

8         Proceedings reported by machine shorthand, and

9    transcript produced by computer-aided transcription.

10

11   Reported by:

12        JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
          United States Court Reporter
13        333 Lomas Boulevard, Northwest
          Albuquerque, New Mexico  87102
14        Phone:  (505)348-2209
          Email:  Julie_Goehl@nmd.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25

1                  FAIRNESS HEARING (VIA ZOOM)

2              (Court in session at 2:00 p.m.)

3         THE COURT:  Good afternoon, everybody.

4         We are here this afternoon for a fairness

5  hearing in the case of -- it's J-A-M-I-N, Jamin.  How do

6  you say that, Mr. Davis?

7         MR. PHILIP DAVIS:  Jamin Bailon, Your Honor.

8         THE COURT:  Jamin Bailon and Romie Adams, as

9  Personal Representative of the Wrongful Death Estate of

10  John Thaddeus Bailon, and Next Friend of A.B., a Minor

11  Child v. Valencia County Board of County Commissioners

12  and Joseph Rowland and Juan Rodriguez, in both their

13  individual and their official capacities.

14         May I have appearances, please?

15         MR. PHILIP DAVIS:  Yes, Your Honor.  Philip

16  Davis for the plaintiffs.

17         MR. STEVEN CHAVEZ:  Steven Chavez, Your Honor,

18  for the plaintiffs.

19         MS. ROMIE ADAMS:  Romie Adams, personal

20  representative.

21         MS. JONLYN MARTINEZ:  Jonlyn Martinez on

22  behalf of the defendants, Your Honor.

23         THE COURT:  Okay.  And we are using a court

24  reporter.  Let me ask, Ms. Goehl, if you can hear -- not

25  if you can hear, but do you need this recorded in

1    addition to your own procedure?  Do you want me to

2    record it on Zoom?

3              THE COURT REPORTER:  No, Your Honor.

4              THE COURT:  Okay.  She has indicated "No,"

5    although she was on mute.  I think she indicated "No,"

6    so we will just go ahead with this hearing just using

7    the systems of the court reporter.  She may be recording

8    it also for her own purposes.

9              All right.  So it is a fairness hearing.  At a

10    fairness hearing, the question, of course, is

11    essentially whether the proposed settlement is in the

12    best interests of the minor child, who in this case is

13    A.B.

14              My first question to the parties is whether we

15    need to seal any portion of this hearing?  And let me

16    start with you, Mr. Davis.  My intent is to continue to

17    refer to the child as "A.B."  But, Mr. Davis, do you see

18    any reason to seal the hearing?

19              MR. PHILIP DAVIS:  I don't, Your Honor.  The

20    minor child is 17, she turns 18 in February, and I don't

21    see the need to seal it.  And quite frankly, if you are

22    more comfortable using her initials, we can, but I'm not

23    opposed to using her name.

24              THE COURT:  Okay.  I suppose I prefer using

25    her initials because under our court filing rules, if

1   anything involves a minor, it needs to be -- for

2   example, if we had a transcript prepared of this at any

3   time, then we'd have to go through the transcript, and

4   any time we referred to her actual name, we'd have to

5   change it to "A.B."  So I think it's just easier if we

6   refer to her by her initials.

7            MR. PHILIP DAVIS:  That's fine, Your Honor.

8   We are happy to do that.

9            THE COURT:  Okay.  Ms. Martinez, do you agree

10   there's no reason to seal any portion of this hearing?

11            MS. JONLYN MARTINEZ:  I do agree, Your Honor.

12            THE COURT:  Okay.  So then also, of course,

13   with respect to whether or not this proposed settlement

14   is in the best interests of the child, I need to

15   consider four different factors:

16            One.  Whether the proposed settlement was

17   fairly and honestly negotiated.

18            Two.  Whether serious questions of law and

19   fact exist placing the ultimate outcome of the

20   litigation in doubt.

21            Three.  Whether the value of an immediate

22   recovery outweighs the mere possibility of future relief

23   after protracted and expensive litigation.

24            Four.  Whether in the judgment of the parties,

25   that the settlement is fair and reasonable.

1          So I'm going to give everybody a chance to

2     weigh in on those issues.  I think I will start with

3     you, Mr. Davis, or actually, Mr. Chavez.  I don't know

4     who prefers to proceed.  Whoever wants to speak for the

5     plaintiff, if you could first tell me the basic terms of

6     the settlement agreement, and then go on to address some

7     of those other issues; how it was negotiated; serious

8     questions of law and fact; value of an immediate

9     recovery over possibility of future relief; and whether,

10    in your view, the settlement is fair and reasonable.

11          So, again, whoever wishes to speak for the

12    plaintiffs, Mr. Davis or Mr. Chavez?

13          MR. PHILIP DAVIS:  Yes, Your Honor.  It's Phil

14    Davis, and I'll do that.

15          I believe that the proposed settlement is fair

16    and reasonable to the minor.  I think it was fairly and

17    honestly negotiated.  The case settled for $125,000

18    inclusive of damages, fees, costs, applicable gross

19    receipts tax.  This case was mediated several months

20    ago, and the defendants did not offer a lot of money.

21    The settlement mediation conference was actually

22    extremely short.  I don't think it lasted an hour.  I

23    thought that the most profound comment that we got from

24    the mediator in that was, "Well, you'll get to a jury;

25    and boy, are you in trouble once you get there."

1          And he was absolutely right; and, in fact, he

2     wasn't telling us anything that we didn't already know.

3     This is a wrongful death shooting case that started in

4     State Court under state law.  We discovered it, and we

5     established in our own minds a good faith basis to amend

6     the complaint, bring a 1983 action upon which Ms.

7     Martinez promptly removed, which we expected her to do.

8     So we were faced, obviously, with qualified immunity in

9     regard to the use of deadly force under the Fourth

10    Amendment.

11         The other big picture issue for us -- well,

12    there were two, one on liability and one on damages.

13    Liability.  The officers were deposed, and they told a

14    story that seemed coherent and seemed compelling and was

15    absolutely in contradiction to what our expert witnesses

16    told us the evidence established as a matter of

17    ballistics, blood spatter, and accident reconstruction,

18    which meant that we were faced with the prospect of

19    persuading a jury that the officers were lying about

20    what happened.

21         And we also were faced with the prospect of

22    having a jury believe a bunch of experts instead of real

23    honest to goodness walking, talking police officers.

24    And I've been around enough to know that was an uphill

25    battle from the start.  Even if my experts spoke matters

1    that were truthful and compelling, the officers' story

2    just didn't square with it.

3            There was only one eyewitness to the shooting

4    other than the two officers who were present at the

5    scene and who fired their weapons at the decedent.  That

6    eyewitness was a woman who was in the mobile home

7    adjacent to the yard where the decedent was in a car,

8    trying to flee, when he was shot to death by the

9    officers.  The eyewitness initially told investigating

10   officers at the scene that she had seen nothing, and she

11   later confided to Mr. Chavez's investigator that she

12   told them that because, one, she distrusted police

13   officers; and two, that she was fearful of retaliation

14   if she told the officers a story that they did not want

15   to hear, which was that there was no reason for them to

16   have shot Mr. Bailon to death.

17           So here we are, faced with an investigation

18   that tells us that the eyewitness said, "I saw nothing,"

19   and then she tells us a story that actually corroborates

20   what our experts are telling us.  Well, that sounds like

21   good news right up until the moment that Ms. Martinez

22   notices up our eyewitness for deposition.  And Ms.

23   Martinez is a skillful, experienced, relentless

24   examiner, and the upshot was that the eyewitness simply

25   lost it and exploded in a vulgar verbally abusive

1     torrent of epithets against Ms. Martinez, after which

2     she got up and walked out, which basically left us with

3     no eyewitness because it became impossible at that

4     point, in our judgment, to put her on the stand.

5          That was the problem with liability.

6          The comparative fault under state law was

7     obvious because of the story in regard to how this man

8     had endangered the officers' lives.  And I don't need to

9     explain to you why qualified immunity is always a

10    problem in a deadly force case.

11         On damages in the case, in particular the

12    decedent had spent most of his life in prison; had no

13    earnings history; had no real particular connection to

14    his family, including his two children, and had limited

15    contact with them in the several months before he was

16    shot to death.  And then Ms. Martinez unearthed from the

17    Department of Corrections a series of literally hundreds

18    of tape-recorded phone calls that the decedent had made

19    while he was incarcerated, and one was worse than the

20    next in terms of statements that the decedent made in

21    regard to his relationship with his children, among

22    other things, which essentially trashed our loss of

23    consortium claims and left us with a case that was

24    highly risky on liability and highly risky on damages.

25    Based on that, the defendants did not rely very much to

1    mediation.

2          Afterward, Ms. Martinez and I began a fairly

3    frank conversation about what it would take to get the

4    case settled.  We made offers back and forth.  Let me

5    qualify that.  We made an offer, and it was rejected.

6    We made another offer, and it was rejected.  And then we

7    made a third offer that Ms. Martinez persuaded the

8    Association of Counties to accept, and that was the 125.

9          So I think that the case was fairly and

10   honestly negotiated.  I think that there are serious

11   questions of law and fact that left us with a case that

12   might have had a good result, but almost more certainly

13   would have had a bad result.

14          The value now versus the future relief, in

15   light of the difficulty of proving damages, is quite

16   frankly a no-brainer for us.  And as a result, even

17   though the two children are not getting very much money

18   out of this settlement, it's fair and reasonable.

19          The costs for us were enormous.  Mr. Chavez

20   and I booked over $150,000 in attorneys' fees, and

21   together we are accepting fees out of the settlement of

22   about $40,000, which is about 25 cents on the dollar,

23   based on our hourly rates.

24          What we did was, we took the $125,000.  There

25   was $7500 in my trust account left over from an IPRA

1    case that we had prevailed on against the Department of

2    Public Safety, and we added those together to get

3    $132,500.  We subtracted $50,000 for costs, and that did

4    not include about $10,000 in costs that Mr. Chavez and I

5    wrote off.

6          So after $50,000 in costs getting reimbursed,

7    that leaves $82,500, and what we decided to do was

8    simply split it four ways:  One quarter to Jamin Bailon;

9    one quarter to A.B.; and then a quarter each to Mr.

10   Chavez and me.  So the number is approximately $20,625

11   that each of us is getting out of the settlement.

12         Ms. Adams also agreed to reduce her personal

13   representative fees substantially in order to enable us

14   to get this case settled.  I have worked with Ms. Adams

15   before in wrongful death cases as the personal

16   representative, and I know that the fee that she agreed

17   to take in this case is substantially less than what she

18   would have expected in the normal case.

19         So for all those reasons, I think that there

20   is clearly a record to satisfy the Court that it can

21   approve this settlement as being in the best interests

22   of the minor.

23         THE COURT:  Okay.  Thank you, Mr. Davis.  I

24   have a couple of questions.  With respect to the

25   qualified immunity defense, what was the allegation

1    there?  Was it that the officers were in fear for their

2    lives when he started to flee in his automobile?

3              MR. PHILIP DAVIS:  Yes.  What the officers did

4    was, one of the officers testified -- the sergeant

5    testified that the car started to go backwards; that the

6    driver's door was open; that he was actually inside the

7    open driver's door; and as the car started to go

8    backwards, he feared that he would be pulled under the

9    car because he was caught in the door.  Our ballistics

10   established that his story of being inside the door was

11   not right, but that was the allegation that was the

12   justifiable homicide defense, was fear for harm to

13   himself.  And then the other officer testified that he

14   saw his sergeant was in danger and he fired shots in

15   order to protect the life of his sergeant.

16             THE COURT:  Okay.  And was it the other

17   officer who was the shooter, or did they both shoot?

18             MR. PHILIP DAVIS:  They both shot.

19             THE COURT:  Okay.  And then just -- and this

20   may be a stupid question, so I'll just put it in that

21   category, but just for my own edification, I'm always a

22   little confused.  Does there always seem to be a

23   personal representative in a wrongful death estate?  And

24   is there a requirement that that be a particular -- I

25   mean, is there any qualification for that role?

1          MR. PHILIP DAVIS:  The answer to your first

2     question is "Yes."  State law requires a personal

3     representative be appointed in order to bring the cause

4     of action on behalf of the estate.

5          And the answer to your second question is that

6     the qualification is that the personal representative

7     agrees to accept the appointment and act consistent with

8     state law.  And the role of the personal representative

9     under state law is essentially to ensure that the

10    settlement monies, if recovered, are properly

11    distributed among the beneficiaries of the estate.

12         THE COURT:  Which may be different than, for

13    example, if the person had a will?

14         MR. PHILIP DAVIS:  No, Your Honor.  And I'm

15    treading lightly on areas that I'm not terribly familiar

16    with, and Mr. Chavez may be able to do a better job, but

17    the res that is the cause of action that belongs to the

18    estate of a decedent who alleges a wrongful death

19    doesn't pass through a will, and so the beneficiaries

20    are based on state law in regard to who the survivors

21    are of the decedent.

22         THE COURT:  Yes, I suppose that's what I

23    meant, was that the beneficiaries are beneficiaries that

24    are identified just by law, and not necessarily

25    beneficiaries of somebody's estate if they have a will?

1          MR. PHILIP DAVIS:  That is correct, Your

2     Honor.

3          THE COURT:  Okay.

4          MR. STEVEN CHAVEZ:  Fiduciary duties, Your

5     Honor, are basically the same in state law as in

6     wrongful death law.

7          THE COURT:  Okay.  And does the personal

8     representative owe a fiduciary duty towards the

9     beneficiaries at all?

10         MR. PHILIP DAVIS:  Yes.  The fiduciary duty is

11    to ensure that the beneficiaries properly receive the

12    distributions to which they are entitled from the estate

13    of the decedent in the wrongful death action.

14         THE COURT:  Is there any requirement that she,

15    in this case, act in the best interests of the

16    beneficiaries in, for example, negotiating a settlement?

17         MR. PHILIP DAVIS:  I think that that's part of

18    her fiduciary duty.  I think that she would not -- well,

19    let me try it this way.  The personal representative

20    ultimately is the real party in interest who consents to

21    the settlement; and in so doing, she has a fiduciary

22    obligation to the beneficiaries to ensure that her

23    consent to the settlement is based on reason.

24         THE COURT:  Okay.  And then you said that you

25    had used Ms. Adams before, so I assume she has some

1    professional capacity in which you would have used her

2    before.  What is that?  Is she an attorney?

3            MR. PHILIP DAVIS:  Well, Your Honor, there is

4    no professional qualifications for a personal

5    representative, but I've worked with Ms. Adams in a

6    couple other wrongful death cases, and I know that she

7    has been a personal representative appointed in about a

8    dozen wrongful death cases.  So she has what I would

9    call on-the-job experience, as well as having dealt with

10   a number of highly skilled and experienced plaintiffs'

11   lawyers in wrongful death cases that resulted in

12   recoveries of substantial sums.

13           THE COURT:  Okay.  Anything else you want to

14   say, Mr. Davis?

15           MR. PHILIP DAVIS:  None, Your Honor.  Thank

16   you.

17           THE COURT:  All right.  Mr. Chavez, do you

18   have anything that you would like to add to what

19   Mr. Davis has said?

20           MR. STEVEN CHAVEZ:  Your Honor, just a little

21   -- a few seconds of history.  The mother of the children

22   did consent to the personal representative to act as the

23   personal representative of this case, and so we went

24   through that with all the clients in this case.  So

25   there was consent there from the child, from the mother,

1    and from Mr. Jamin Bailon.

2              That's all I would like to add, Your Honor.

3              THE COURT:  Okay.  And then, Ms. Martinez, why

4    don't you talk about the issues, the relevant issues

5    from your perspective.  And if you want me to go over

6    those again, I'm happy to.  If you remember what they

7    are, either restating them or -- because you are very

8    experienced in this matter.  Just please go ahead.

9              MS. JONLYN MARTINEZ:  Okay.  Thank you, Your

10   Honor.

11             First, I would like to thank the Davises and

12   all counsel for their professionalism, because this was

13   a difficult case.  It involved a wrongful death and high

14   emotions on both sides, and they were excellent to work

15   with, so that made the resolution of this case much

16   easier, even though it was a very difficult case.

17             We went and attended a mediation with Judge

18   Malott in February of 2020, and we were unable to

19   resolve it at that time.  But since that time, Mr. Davis

20   was very helpful in continuing settlement discussions,

21   and we continued settlement discussions up until we were

22   able to reach a settlement.  So those discussions, as he

23   stated, those did continue for almost six months until

24   we were able to finally reach a resolution in this case.

25   So we did go back and forth for a long time, working on

1    a reasonable resolution of this case, and it did take

2    almost six months.  And this case did have to go before

3    the Board of County Commissioners and executive session,

4    where there was high debate about whether the settlement

5    was appropriate.  And ultimately, they approved the

6    settlement.

7             There were contested issues of fact and law,

8    as Mr. Davis stated.  He did have his experts, I had my

9    own experts, so it was going to be a battle of experts

10   at trial, as well as my clients' testimony.  So there

11   was absolutely disputes of fact.  And as he stated, my

12   clients did contend that they were simply defending

13   themselves when they discharged their firearms in this

14   case.

15            So at the conclusion of discovery, I was going

16   to move for summary judgment.  And the case was going to

17   be very expensive.  The plaintiffs, I think, had five or

18   six experts, I had several experts, so there were going

19   to be many, many depositions that were going to be very

20   costly in this case.

21            And I think -- I agree with counsel.  I'm not

22   sure what a jury would do with this case.  You know, on

23   the one hand, there was the death of an individual which

24   is always horrible.  But on the other hand, as Mr. Davis

25   mentioned, we did have -- I think we had 400 recordings

1    of the decedent talking about various aspects of his

2    activities from, you know, animal cruelty, pictures of

3    his children, just a wide array of behaviors that would

4    have reflected poorly on him and his care of his

5    children.

6           And so at the end of the day, I think that --

7    I do believe, Your Honor, the settlement was fair and

8    reasonable.  I think Mr. Davis and Mr. Chavez negotiated

9    and obtained a fair settlement on behalf of their

10   clients, and I do believe it's fair and reasonable under

11   the circumstances, Your Honor.

12          THE COURT:  Okay.  I think at this point maybe

13   I'll ask you, Ms. Adams -- and I am going to place you

14   under oath, if you don't mind.

15          Please raise your right hand.  Do you solemnly

16   swear that the testimony you are about to give is true

17   and correct to the best of your knowledge?

18          MS. ROMIE ADAMS:  I do.

19          THE COURT:  All right.  So you heard

20   Mr. Davis -- and actually, could you please, while we

21   can see how your name is spelled, is it R-O-M-I-E Adams?

22          MS. ROMIE ADAMS:  That's correct.

23          THE COURT:  Okay.  So could you just tell me

24   about your background a little bit, and how it is you

25   became personal representative of the wrongful death

1    estate in this case.

2              MS. ROMIE ADAMS:  I'm retired.  I've worked

3    with many agencies throughout the state.  I have three

4    children and four grandchildren.  I'm married.  And I

5    started working with attorneys -- or actually, lawyers.

6    My husband's cousin was an attorney, so we started

7    working with him and have continued working as personal

8    representatives for different lawyers that, you know,

9    have asked us or have asked me to serve as a personal

10   representative in their cases.

11             THE COURT:  Okay.  And how many cases have you

12   been a personal representative in, about?

13             MS. ROMIE ADAMS:  Oh, around -- right around

14   maybe 12 or so.

15             THE COURT:  Okay.  And is there any difference

16   in your relationship as a personal representative versus

17   you're also next friend to A.B.?  And, again, that's a

18   role that I just am trying to understand, to see if it's

19   any different from being the personal representative.

20   Or how is your role different as next friend?

21             MS. ROMIE ADAMS:  There's really not a

22   difference.  I mean, when I serve as personal

23   representative, I serve to the capacity that I am asked

24   to serve it which is, you know, in the best interests of

25   the minor child or children.

1          THE COURT:  Okay.

2          MS. ROMIE ADAMS:  Of each individual case.

3          MR. PHILIP DAVIS:  Your Honor, if I may?

4          THE COURT:  Sure.

5          MR. PHILIP DAVIS:  Ms. Adams is personal

6   representative of the estate because the estate has the

7   wrongful death claim.  She's next friend of A.B. because

8   A.B., as a child, cannot bring her claim for loss of

9   consortium and needs somebody to do it for her, and

10  that's the next friend rule.

11         THE COURT:  Okay.  But I'm just wondering if

12  there's a possibility at all of like a conflict.

13         MR. PHILIP DAVIS:  No, no conflict.  I'm

14  sorry.  I didn't mean to interrupt, Your Honor.

15         THE COURT:  That's okay.

16         MR. PHILIP DAVIS:  There is no conflict

17  because in this case in particular, the loss of

18  consortium claim that the children have is essentially

19  no different than their being beneficiaries of the

20  estate.  And so the only recipients of either the estate

21  or the loss of consortium claims is the same two

22  children.

23         THE COURT:  Okay.  And then, Ms. Adam, I'm

24  going to ask you a few questions about the negotiations

25  in this case.  When the settlement -- well, first, did

1   you participate in that first mediation with Judge

2   Malott?

3              MS. ROMIE ADAMS:  Yes, I did.

4              THE COURT:  Okay.  And did also Jamin Bailon

5   participate, Ms. Adams?

6              MS. ROMIE ADAMS:  Phil, did he participate?

7              MR. PHILIP DAVIS:  I don't remember if the

8   younger Mr. Bailon was at the mediation.  I think Steve

9   was there in his behalf.

10             THE COURT:  Okay.  So, Ms. Adams, during that

11  negotiation and in the negotiations that happened after

12  that, were you consulted before Mr. Davis would take an

13  offer to Ms. Martinez?

14             MS. ROMIE ADAMS:  Mr. Davis was really good

15  in informing me and keeping me up-to-date on all

16  negotiations throughout the case.

17             THE COURT:  Did you approve the ultimate

18  demand of $125,000?

19             MS. ROMIE ADAMS:  After speaking with

20  Mr. Davis, we all decided that it was in the best

21  interests of the minor child to agree on the settlement.

22             THE COURT:  Okay.  And when you say "we all,"

23  who all was involved in that decision?

24             MS. ROMIE ADAMS:  Well, Mr. Davis, Mr. Chavez,

25  and myself.  And I know he spoke with the family of Mr.

1    Bailon.

2             THE COURT:  I'm sorry.  I missed that.

3             MS. ROMIE ADAMS:  The family.  Mr. Davis was

4    in contact with the family of Mr. Bailon.

5             THE COURT:  Okay.  And maybe I'll get back to

6    that at the end.  All right.  How familiar -- are you

7    familiar with A.B.'s circumstances right now?

8             MS. ROMIE ADAMS:  Yes, I am.

9             THE COURT:  Okay.  And how did you become

10   familiar with her circumstances?  Have you met her?

11            MS. ROMIE ADAMS:  I haven't met her in person,

12   but I have spoken to her over the phone.

13            THE COURT:  About how many times?

14            MS. ROMIE ADAMS:  I've only spoken to her

15   once.

16            THE COURT:  And you know Mr. Davis said that

17   she's 17.  When will she be 18?

18            MS. ROMIE ADAMS:  In six months.  She will

19   turn 18 in February.

20            THE COURT:  Did you talk to her about the

21   settlement before you agreed to the settlement?  Or no?

22            MS. ROMIE ADAMS:  No.

23            THE COURT:  Okay.  As far as you know, is

24   there any -- is it any problem with her, once she turns

25   18, sort of living on her own?  Does she have any

1    disabilities or any issues like that, that would make it

2    difficult for her to live on her own?

3            MS. ROMIE ADAMS:  I don't think so.

4            THE COURT:  Okay.  And given your role in the

5    case and your knowledge of the case, do you agree that

6    there were serious questions of law and fact which could

7    place the outcome of the litigation in doubt?

8            MS. ROMIE ADAMS:  Yes.

9            THE COURT:  Do you also believe that the value

10   of an immediate recovery outweighs the possibility of

11   future relief after protracted and expensive litigation?

12           MS. ROMIE ADAMS:  Yes.

13           THE COURT:  Now, you heard Mr. Davis talk

14   about how the fees and I guess your own fees were

15   basically being -- how you were agreeing to take the

16   settlement funds and divide it among everybody.  Do you

17   believe that those fees are -- well, first, let me start

18   with the attorneys' fees.  They're each getting the same

19   amount that each minor child is getting -- or I'm sorry

20   -- the amount that A.B. is getting, and then also the

21   other child who is not a minor child.

22           MS. ROMIE ADAMS:  Yes.

23           THE COURT:  You heard that discussion?

24           MS. ROMIE ADAMS:  Yes.

25           THE COURT:  Do you believe that that is a fair

1    fee arrangement, given the circumstances?

2              MS. ROMIE ADAMS:  Yes, I do.

3              THE COURT:  And why?

4              MS. ROMIE ADAMS:  Because of the amount of the

5    settlement and because of the cost.

6              THE COURT:  I'm sorry, Ms. Adams.  We're

7    having a little bit of trouble, and I'm wondering if

8    maybe sometimes it's easier if you turn off your video,

9    then the audio comes through a little better.  Do you

10   mind trying that, turning off your video and then

11   talking again?

12             MS. ROMIE ADAMS:  Okay.  Is that better?

13             THE COURT:  So far.

14             MS. ROMIE ADAMS:  Okay.

15             THE COURT:  So go ahead and tell me why you

16   think that fee is fair and reasonable.

17             MS. ROMIE ADAMS:  Like I mentioned earlier, I

18   think it's fair due to the facts and the circumstances

19   of the case and the amount of the settlement.  So I

20   think it's fair on the amounts that everybody had to

21   split after the experts were paid.

22             THE COURT:  Okay.  And it sounds like you're

23   being paid out of the costs?  Is that correct?

24             MS. ROMIE ADAMS:  That is correct, uh-huh.

25             THE COURT:  Okay.  And that's only a portion,

1    I take it, of the -- was it about $50,000 that was being

2    devoted to costs?

3              MS. ROMIE ADAMS:  That's correct.

4              THE COURT:  Okay.  And you're getting a

5    portion of that $50,000?

6              MS. ROMIE ADAMS:  Yes.  I'm getting $2500 out

7    of that, as personal representative.

8              THE COURT:  Okay.  Do you have any sense --

9    well, actually, never mind.  Forget that question.

10             Do you have any questions, Ms. Martinez, for

11   Ms. Adams?

12             MS. JONLYN MARTINEZ:  Yes, Your Honor.  I had

13   muted myself to try to make it quiet.

14             THE COURT:  Okay.

15             MS. JONLYN MARTINEZ:  Ms. Adams, are you

16   comfortable that the settlement proceeds, the payment of

17   the settlement proceeds, is in the best interests of

18   A.B.?

19             MS. ROMIE ADAMS:  Yes, I am.

20             MS. JONLYN MARTINEZ:  Okay.  And you

21   understand that to the extent the settlement proceeds

22   are mismanaged by A.B. or they are lost by A.B., she

23   can't bring any additional claims against the defendants

24   in this case, correct?

25             MS. ROMIE ADAMS:  That is correct.

1          MS. JONLYN MARTINEZ:  Okay.  And you

2    understand that you are releasing any and all claims

3    that may have been brought on behalf of A.B. in this

4    matter?

5          MS. ROMIE ADAMS:  Yes.

6          MS. JONLYN MARTINEZ:  Or the estate of

7    Mr. Bailon, correct?

8          MS. ROMIE ADAMS:  That is correct.

9          MS. JONLYN MARTINEZ:  You understand that

10   you're waiving the right to a jury trial?

11         MS. ROMIE ADAMS:  That is correct.

12         MS. JONLYN MARTINEZ:  You understand that the

13   defendants are not admitting any liability in this case?

14         MS. ROMIE ADAMS:  That is correct.

15         MS. JONLYN MARTINEZ:  You understand that from

16   the settlement proceeds, all costs, fees and expenses

17   must be paid, including any medical expenses related to

18   this claim?

19         MS. ROMIE ADAMS:  That is correct.

20         MS. JONLYN MARTINEZ:  And have you had an

21   opportunity to review the release in this case?

22         MS. ROMIE ADAMS:  No, I haven't.

23         MS. JONLYN MARTINEZ:  Okay.  And do you agree

24   that if any other claims are filed against the

25   defendants by anyone related to the estate, that the

1    estate will indemnify the defendants for any claims that

2    were settled in these proceedings?

3              MS. ROMIE ADAMS:  I'm not understanding that

4    question.  Phil, can you help me out with that one?

5              MR. PHILIP DAVIS:  Yes, Your Honor.  We are

6    waiting to send the release to Ms. Adams until

7    Mr. Bailon has signed off on it, so she hasn't seen it.

8    But Ms. Martinez's question is an accurate question, and

9    the answer is properly "Yes," that the estate has agreed

10   to indemnification as a condition of the settlement

11   release.

12             MS. JONLYN MARTINEZ:  Thank you, Mr. Davis.

13             Ms. Adams, you understand that other than the

14   payment of the settlement proceeds, there has been no

15   other inducement or representations relied on by you

16   that were made by the defendants or anyone else, other

17   than the payment of the settlement proceeds, correct?

18             MS. ROMIE ADAMS:  That is correct.

19             MS. JONLYN MARTINEZ:  And you are entering

20   into the settlement voluntarily?

21             MS. ROMIE ADAMS:  Yes, I am.

22             MS. JONLYN MARTINEZ:  And you understand that

23   if the Court enters an order approving the settlement,

24   that A.B.'s claims and the estate's claims will be

25   extinguished forever?

1      MS. ROMIE ADAMS:  I understand that.

2      MS. JONLYN MARTINEZ:  And that A.B. can't

3   change her mind, and that you can't?

4      MS. ROMIE ADAMS:  I'm sorry?

5      MS. JONLYN MARTINEZ:  I'm sorry.  A.B. can't

6   change her mind, and you can't change your mind about

7   agreeing to the settlement?

8      MS. ROMIE ADAMS:  That is correct.  I agree.

9      MS. JONLYN MARTINEZ:  And do you believe that

10   under the circumstances, the settlement is fair,

11   reasonable, and in the best interest of the estate and

12   A.B.?

13      MS. ROMIE ADAMS:  I agree that it is fair and

14   reasonable on behalf of the minor child.

15      MS. JONLYN MARTINEZ:  And are you the personal

16   representative in addition to the rest of the estate of

17   Mr. Bailon?

18      MS. ROMIE ADAMS:  Yes.

19      MS. JONLYN MARTINEZ:  Okay.  And you agree

20   that it is fair and reasonable with regard to the entire

21   estate, correct?

22      MS. ROMIE ADAMS:  Correct.

23      MS. JONLYN MARTINEZ:  Okay.  Those are all my

24   questions, Your Honor.  Thank you.

25      THE COURT:  Okay.  I have a couple more

1  questions, Ms. Adams.  I just wanted to make sure that

2  you understood.  Did you understand that you are not

3  required to settle this case, and you could take it to

4  trial if you wanted to?

5          MS. ROMIE ADAMS:  I understand that.

6          THE COURT:  And you understand that if you

7  went to trial, that it's possible that the outcome could

8  have been different than what the settlement is?  In

9  other words, the estate, it's possible, could have

10  gotten more or less than what you're settling for?  Did

11  you understand that?

12          MS. ROMIE ADAMS:  I understood that, yes.

13          THE COURT:  Did anybody threaten you or force

14  you in any way to get you to settle these claims?

15          MS. ROMIE ADAMS:  No, Your Honor.

16          THE COURT:  Are you confident that you

17  understand the terms of the settlement in this case?

18          MS. ROMIE ADAMS:  I understand the terms of

19  this settlement.

20          THE COURT:  Okay.  So given those additional

21  questions that I had, Ms. Martinez, do you have anything

22  further?

23          MS. JONLYN MARTINEZ:  No, Your Honor, I do

24  not.  Thank you.

25          THE COURT:  Mr. Davis, do you have anything,

1    any further questions?

2                MR. PHILIP DAVIS:  No, Your Honor.

3                THE COURT:  I'm sorry?

4                MR. PHILIP DAVIS:  No, Your Honor.

5                THE COURT:  Okay.  And Mr. Chavez, do you have

6    any questions for Ms. Adams?

7                MR. STEVEN CHAVEZ:  No, Your Honor.  Thank

8    you.

9                THE COURT:  There was one question I did want

10    to ask you, Mr. Davis.  Based on the information that we

11    received from Ms. Adams, she said that you had been in

12    touch with the family, as well, and I'm just wondering

13    if you could tell me what their view was of the

14    settlement, since they're not here to speak for

15    themselves?  I just would like to get an understanding

16    of, I believe, the mother.  You may have consulted with

17    the mother.  I don't know if you consulted with A.B., as

18    well.  But if you could just give me their view.

19                MR. PHILIP DAVIS:  Yes, Your Honor.  Ms. Adams

20    actually misstated it.  It was Mr. Chavez who has had

21    the primary contact with the family, so I would ask that

22    he respond to your question.

23                THE COURT:  Okay.  Mr. Chavez?

24                MR. STEVEN CHAVEZ:  Thank you, Your Honor.

25    Yes, Your Honor, I've been in very close contact with

1    this family.  They live in the same county that I live

2    in.  I've met with them in person in my office at least

3    six times throughout this litigation, and I've talked

4    with them on the phone at least once a month, sometimes

5    more often.  During settlement negotiations, I was

6    talking to them very often, probably at least a dozen

7    times during all the negotiations.

8           There has been -- as Ms. Martinez stated and

9    Mr. Davis stated, we've had ongoing negotiations for

10   quite some time, and so that forced us to certainly

11   speak with the mother and Mr. Bailon, Jamin Bailon.  He

12   is 21 years old.  He works full-time and he works a lot.

13   So we asked him if he wanted to be part of this hearing.

14   We asked Ms. Martinez if it was necessary that he be at

15   this hearing.  And Mr. Bailon couldn't make it to this

16   hearing, and Ms. Martinez said it wasn't necessary.

17          But, yes, I did speak with them as recently as

18   yesterday regarding today's hearing.  Actually, I spoke

19   with the mother, Naomi, this morning regarding the

20   hearing and regarding the release.  So Mr. Bailon has

21   reviewed the release.  They intend to drop it off to me

22   in the next day or two, to my office.  And so they have

23   approved it and they do consent with the settlement.

24          You know, what is interesting is when I spoke

25   to A.B. -- I was speaking with A.B. and with Ms. Adams

 1  this weekend, and one of the things she said is she

 2  agreed with the settlement, but that nothing -- no

 3  amount of money will ever bring back her father, so she

 4  really wasn't interested in the money in the first

 5  place; she was interested in what she believed was

 6  justice for the case.  And then the elderly or the older

 7  Bailon, he was certainly consenting to the settlement,

 8  as well.

 9          Thank you.  Hopefully that answers your

10  question.

11          THE COURT:  Yes.  And since you do have the

12  relationship, maybe you could make sure, is there any --

13  well, my understanding, and this actually comes from the

14  earlier conference that we had, and it wasn't on the

15  record, so we might as well put it on the record.  My

16  understanding is that there's a small amount of money

17  that you intend to use from this settlement, or A.B.

18  intends to use from the settlement, kind of right off

19  the bat to purchase a car so that she can continue her

20  education, but then the rest of the funds will be put in

21  some sort of CD.

22          Could you tell me the more precise

23  arrangements for that and when she would have access to

24  the CD?

25          MR. STEVEN CHAVEZ:  Yes, Your Honor.  So what

1    was agreed to is essentially, she's going to get $7500

2    so she can purchase a used car to go to the Valencia

3    County UNM branch.  She needs a car.  She lives far away

4    from anything, actually.  It's a very rural area of the

5    county.  The rest of it will be placed in a three-year

6    CD in her name, and she'll access it after three years.

7    It will be in her name.

8         I'll set that up.  I've done it before with

9    numerous clients when there's not a lot of money.  And

10   if you'd like, I could have the personal representative

11   do that, but it's probably easier if I do that.  But I

12   will provide the personal representative documentation

13   that it has been set up, so that we can verify that it

14   has been set up.  And that's essentially it, Your Honor.

15   We tried to structure the money through Kelly Ramsdell.

16   The structure was not -- it didn't have a positive

17   outcome because it was such a small amount of money.

18   Interest rates are so low, and actually it would cost

19   more money, I believe, than it was worth putting it into

20   a structure.  The payment value was literally like $100,

21   $150, after several years.

22         So, yes, we agreed on the CD.  We would ask

23   the Court to approve that.  And, again, I will provide

24   the personal representative a verification that it has

25   been done.

1          THE COURT:  Okay.  And then just also to

2     double-check, I want to make sure that there is no issue

3     with respect to any physical or mental disabilities with

4     the child?

5          MR. STEVEN CHAVEZ:  No issues, Your Honor.

6     That's a very good question.  There are no issues with

7     disability, incapacity at all, with the child, the

8     mother, or Mr. Jamin Bailon.

9          THE COURT:  All right.  And then I guess I

10    should also put on the record, because I want to just

11    make sure it's clear, that the parties have asked me to

12    conduct this fairness hearing without having a GAL, a

13    guardian ad litem, because of the small amount of the

14    settlement and nobody wanted to divert funds from the

15    children to go towards the settlement.  So Mr. Davis,

16    Mr. Chavez, whoever wants to speak, I just want sort of

17    like confirmation, more to just put on the record why it

18    is that you've asked to do this without a GAL.

19         MR. PHILIP DAVIS:  Your Honor, it's partly for

20    what you said, because it's more money, and Mr. Chavez's

21    solution made sense to all of us.  And the other is that

22    because A.B. is 17, we're only a few months away from

23    the age of majority.  It did not seem like a useful

24    expenditure of resources to hire a GAL, when we had an

25    experienced personal representative and experienced

1    counsel on both sides to be able to present the matter

2    to you.

3              THE COURT:  All right.  Ms. Martinez, do you

4    have anything you'd like to add to that?

5              MS. JONLYN MARTINEZ:  No, Your Honor.  I think

6    I felt comfortable simply because it was Mr. Davis and

7    Mr. Chavez.  They are very experienced lawyers, and I

8    trust their judgment.  And if they believe it's fair and

9    reasonable, I think that their judgment speaks for

10   itself.

11             THE COURT:  All right.  Mr. Chavez, anything

12   further that you would like to add?

13             MR. STEVEN CHAVEZ:  No, Your Honor.  Thank

14   you.

15             THE COURT:  All right.  Well, it is my intent

16   at this point, I will find that the settlement is fair

17   and reasonable and in the best interests of the minor

18   child, A.B.  I will approve the settlement.  I will also

19   prepare an order that I would expect to have out by next

20   week.  I'd like to say by the middle of next week, maybe

21   by the end of next week, but it will be next week.  So

22   we'll just do our very best to get it out by next week,

23   assuming no other thing comes up.

24             Does that work for everybody's schedule?  Do

25   you have any problem with that, Mr. Chavez or Mr. Davis?

```
 1              MR. PHILIP DAVIS:  No, Your Honor.

 2              MR. STEVEN CHAVEZ:  No, Your Honor.

 3              THE COURT:  Ms. Martinez, is that all right

 4     with you?

 5              MS. JONLYN MARTINEZ:  Yes.  Thank you, Your

 6     Honor.

 7              THE COURT:  All right.  Anything else that

 8     anybody would like to say with regard to this fairness

 9     hearing?  And, again, I just want to make sure everybody

10     gets on the record anything they want on the record.

11              Mr. Davis, anything further?

12              MR. PHILIP DAVIS:  Nothing further, Your

13     Honor.

14              THE COURT:  Mr. Chavez?

15              MR. STEVEN CHAVEZ:  Only just to thank you,

16     Your Honor, for letting us have this hearing so quickly.

17     Thank you.  Nothing else.

18              THE COURT:  And Ms. Martinez, anything?

19              MS. JONLYN MARTINEZ:  No.  Thank you very

20     much, Your Honor.

21              THE COURT:  All right.  Well, thank you all

22     very much for participating in this hearing.  We'll get

23     our order done as quickly as possible.  And I appreciate

24     your attendance.  Thanks very much.

25              MS. JONLYN MARTINEZ:  Thank you.
```

1          MS. RONNIE ADAMS:  Thank you.

2          THE COURT:  'Bye 'bye.

3          MR. PHILIP DAVIS:  Goodbye.

4          (Proceedings concluded at 2:47 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    UNITED STATES OF AMERICA

2    DISTRICT OF NEW MEXICO

3

4              CERTIFICATE OF OFFICIAL REPORTER

5                   I, Julie Goehl, RDR, CRR, RPR, RMR,

6    New Mexico CCR #95, Federal Official Realtime Court

7    Reporter, in and for the United States District Court

8    for the District of New Mexico, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code,

10   that the foregoing is a true and correct transcript of

11   the stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the

14   Judicial Conference of the United States.

15                   Dated this 4th day of September, 2020.

16

17                   _____

18                   JULIE GOEHL
                     FEDERAL OFFICIAL COURT REPORTER
                     Registered Diplomate Reporter
19                   Registered Professional Reporter
                     Registered Merit Reporter
20                   Certified Realtime Reporter
                     NM Certified Court Reporter #95
21                   333 Lomas Boulevard, Northwest
                     Albuquerque, New Mexico  87102
22                   Phone:  (505)348-2209
                     Email:  Julie_Goehl@nmd.uscourts.gov
23

24

25